IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CENTRIX HR, LLC                           :              CIVIL ACTION

            v.                            :

ON-SITE STAFF MANAGEMENT, INC.    :              NO.  04-5660
d/b/a/ CENTRIX STAFFING, et al.

**<u>MEMORANDUM AND ORDER</u>**

THOMAS J. RUETER                                          June 3, 2008
Chief United States Magistrate Judge

  Presently before the court are: (1) "Plaintiff's Motion for Reconsideration, and/or

for a New Trial or to Correct, Amend or to Supplement the Courts' [sic] March 25, 2008 Order

and/or to Make Additional or Supplemental Findings of Fact Pursuant to Fed. R. Civ. P. 52, 59 &

60" ("Pl.'s Motion") and Memorandum of Law in Support thereof ("Pl.'s Mem. of Law") (Doc.

No. 53); (2) Defendants' Motion for Relief Pursuant to Federal Rules of Civil Procedure 52, 59

& 60 ("Defs.' Motion") (Doc. No. 54); (3) Defendants' Brief in Opposition to Plaintiff's Motion

for Post Trial Relief ("Defs.' Br. in Opp.") (Doc. No. 55); (4) Plaintiff's Response to Defendants'

Motion for Relief Pursuant to Federal Rules of Civil Procedure 52, 59 & 60 ("Pl.'s Resp.") (Doc.

No. 56); (5) Plaintiff's Reply Memorandum of Law in Support of its Post Trial Motion ("Pl.'s

Reply") (Doc. No. 59); (6) Defendants' Reply Memorandum of Law in Support of their Motion

for Post Trial Relief ("Defs.' Reply") (Doc. No. 60); and (7) Plaintiff's Surreply ("Pl.'s

Surreply") (Doc. No. 63).

  The court conducted a bench trial in the above-captioned case from October 22 to

October 24, 2007.  The court filed its Memorandum of Decision and Judgment Order ("MOD")

on March 25, 2008 (Doc. No. 52).  See Centrix HR, LLC v. On-Site Management, Inc., et al.,

2008 WL 783558 (E.D. Pa. Mar. 25, 2008).  The post trial motions followed.  For the reasons set

forth below, plaintiff's motion is denied and defendants' motion is granted in part and denied in

part.[1]

## I.    STANDARD OF REVIEW

"The purpose of a motion for reconsideration is to correct manifest errors of law

or fact or to present newly discovered evidence."  Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909

(3d Cir. 1985).  Reconsideration is proper where the moving party establishes one of three

grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence

that previously was unavailable; or (3) the need to correct a clear error of law or fact or to prevent

manifest injustice.  Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co., 2008 WL

2156719, at *1 (E.D. Pa. May 21, 2008) (citing Max's Seafood Café ex rel. Lou-Ann, Inc. v.

Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)).  Motions for reconsideration may not be used to

argue new issues or facts that were not presented to the court in the matter previously decided.

Id. (citing Johnson v. Diamond State Port Corp., 50 Fed. Appx. 554, 560 (3d Cir. 2002)).

---

[1]    The parties to this case are: (1) plaintiff Centrix HR, LLC ("plaintiff" or "HR");
(2) defendant On-Site Management, Inc. ("On-Site"); (3) defendant Centrix HR Logistics, Inc.
("Logistics"); and (4) defendant William Black ("Black") (On-Site, Logistics and Black
collectively shall be referred to herein as the "defendants").  The court will dispense with a
further recitation of the facts of this case and the background of the litigation.  Those matters are
set forth in detail in the court's March 25, 2008 MOD.

II.   **DEFENDANTS' MOTION**[2]

    1.   **Non-Compete Provision of the Licensing Agreement**

        Defendants first seek reconsideration of this court's conclusion that defendants breached the non-compete provision of the Licensing Agreement. Defendants argue that because the court found that Logistics properly terminated the Licensing Agreement due to plaintiff's violations of the terms thereof, defendants were relieved of their obligations under the non-compete provision of the Agreement.[3] (Defs.' Motion at 1-4.) Defendants cite to the general rule in Pennsylvania that "a party who has materially breached a contract may not complain if the other party refuses to perform his obligations under the contract." Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. Ct. 1998).

        In the MOD, the court concluded as follows:

> that defendant Logistics properly terminated the Licensing Agreement because plaintiff breached the Licensing Agreement by: (1) failing to provide a proper accounting of Logistics' client invoices and collections; (2) failing to pay payroll-related taxes on a timely basis; (3) failing to remit payments when due to Logistics; (4) failing to provide timely accounting records; and (5) disbursing monies collected pursuant to the Licensing Agreement to unauthorized entities, such as EMG. The court also finds that defendant Logistics gave proper notice to plaintiff of the termination under the terms of the Licensing Agreement. Defendant Logistics gave plaintiff a right to cure the defaults in accordance with the terms of the Agreement. See Ex. P-2 ¶ 20.

MOD, 2008 WL 783558, at *15.

_____

    [2]    The court will address defendants' motion first since disposition of one of defendants' claims impacts some of plaintiff's claims.

    [3]    On March 15, 2002, plaintiff, the Licensor, and defendant Logistics, the Licensee, entered into a Licensing Agreement. (MOD Findings of Fact ¶ 5 (citing Ex. P-2).) The court concluded that defendant Logistics properly terminated the Licensing Agreement. (MOD Conclusions of Law ¶ 4.) The court further concluded that defendants had violated the non-compete provision and awarded plaintiff nominal damages. (MOD Conclusions of Law ¶ 5.)

The plain language of the non-compete provision in the Licensing Agreement undermines defendants' claim that they were no longer required to honor the requirements of that provision upon termination of the agreement.  The non-compete provision provides as follows:

> **Licensee Non-Competition and Confidentiality.**  Neither the Licensee nor any persons controlling, controlled by or under common control with Licensee may, without the Licensor's prior written consent:
>
> A.      Have any interest, direct or indirect, in the ownership or operation of any business similar to that of Licensor's business, within the licensed area or within 100 miles thereof, for a period of three years **after expiration or termination of this Agreement**, and may not operate such a business anywhere within the territory or within 100 miles thereof during the term of this Agreement.
>
> Specifically excluded is any business in which Licensee is presently engaged that provides services under a different concept primarily or exclusively to customers who Licensor has rejected or refuses to accept due to Workers' Compensation code or failure to meet credit standards, and/or exclusively uses employees that do not meet Licensor's hiring standards.  Any such business must operate under an entirely separate and dissimilar name, from a separate facility in a location at least two (2) miles from the nearest Licensee office, with unrelated telephone numbers and different staff employees.
>
> For a period of three years **after the termination or expiration hereof**, Licensee shall not, either as an employee, officer, agent or independent contractor, call on or solicit clients for whom Licensor provides payroll administration services.

(Ex. P-2 ¶ 23 (emphasis added).)  Under Pennsylvania law, the intent of the parties to a written contract is contained in the writing itself.  <u>Bohler-Uddehlorm America, Inc. v. Elwood Group, Inc.</u>, 247 F.3d 79, 92 (3d Cir. 2001).  "In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly."  <u>Profit Wize Marketing v. Wiest</u>, 812 A.2d 1270, 1274 (Pa. Super. Ct. 2002).

In the instant case, the plain language of the Licensing Agreement reveals that the parties intended the non-compete provision to remain in effect should either party terminate the Agreement.  The parties specifically stated that the non-compete provision of the Licensing Agreement would be effective upon either expiration <u>or</u> termination of the Agreement. Accordingly, defendants are liable for the breach of the non-compete provision of the Licensing Agreement, even though defendant Logistics was justified in terminating the Agreement because of plaintiff's breaches thereof.  The court also notes that defendants enjoyed the benefits of the Licensing Agreement for almost two years of the three year term of the agreement.  It is not surprising for the parties to agree that defendants not compete with plaintiff after several years of enjoying the benefits of the Licensing Agreement, even though the agreement was terminated prematurely.

Generally, a corporate officer cannot be liable for a breach of contract by his corporation, unless he is himself a party to the contract.  <u>Viso v. Werner</u>, 369 A.2d 1185 (Pa. 1977).  However, if the contract showed an intent to bind individually the corporate officer, he may be liable even though he only signed as a corporate representative.  <u>Id.</u> at 1188.  <u>See</u> <u>also</u> <u>Welsh v. Alarm Security Group, Inc.</u>, 95 Fed. Appx. 399 (3d Cir. 2004) (same); <u>Inoff v. Craftex</u>, 2007 WL 4355385 (E.D. Pa. 2007) (same); <u>Loeffler v. McShane</u>, 539 A.2d 876 (Pa. Super. Ct. 1988) (same).  The non-compete provision of the Licensing Agreement provided not only that Logistics would not compete with plaintiff after termination of the Agreement, but also any person controlling Logistics would not compete.  It is undisputed that Black controlled Logistics at the time Logistics entered into the Licensing Agreement.  Black signed the Licensing Agreement as President of Logistics.  The language of the non-compete provision evinces an

5

intent on the part of Mr. Black to be personally bound by the provision since he was the sole

owner of Logistics, the Licensee, when he signed the Licensing Agreement.  See Licensing

Agreement ¶ 23 (non-compete provision binds the Licensee and "any person controlling,

controlled by or under common control with Licensee").  The court concluded that Black,

through his company On-Site, is operating a business in violation of the non-compete provision.

Therefore, the judgment order entered against defendants for one dollar ($1.00) for breach of the

non-compete provision should not be altered by the court.  Defendants' first argument is without

merit.

### 2.   Mr. Black's Personal Liability Under the Guaranty Agreement

Defendants ask for reconsideration of the court's finding that defendant Black is

personally liable pursuant to the Guaranty Agreement to repay loans from plaintiff to defendant

Logistics.[4]  (Ex. P-3.)  Defendants contend that this court misconstrued the intent and application

of the Guaranty Agreement as it relates to the personal liability of Mr. Black.  (Defs.' Motion at

4-6.)  With respect to the repayment of loans from plaintiff to Logistics, the court concluded as

follows:

> It is clear that Mr. Black and Logistics agreed in writing to repay any loans
> made between HR and Logistics.  In a Notice of Termination dated December 1,
> 2003, terminating the Licensing Agreement, Logistics agreed to the following:
>
> In connection with the termination of the Licensing Agreement, and in accordance
> with its obligations thereunder, Centrix HR Logistics, Inc., will pay all monies
> loaned by Centrix HR, LLC to Centrix HR Logistics, Inc. in equal monthly
> installment over a period of twenty-four (24) months, subject to a final accounting
> of such monies due and confirmation of the same by all parties.

---

[4]   On March 15, 2002, defendants Black and Logistics entered into a Guaranty
Agreement for the benefit of plaintiff and Blaise S. Mazzoni, owner of plaintiff at all times
relevant hereto.  (MOD Findings of Fact ¶ 6.)

> (Ex. P-16; N.T., 10/24/07 at 130.)  Furthermore, in the [Letter of Understanding], executed by the parties in October, 2003, Logistics, through Mr. Black, agreed to repayment of outstanding loans from HR "to pay any operating losses incurred by Centrix Logistics in lieu of tax obligations."  (Ex. P-10.)  Thus, this court concludes that defendants Logistics and Black, individually pursuant to the Guaranty Agreement, (Ex. P-3), are liable to plaintiff for loans made to Logistics pursuant to the Licensing Agreement.

(MOD, 2008 WL 738558, at *12.)  While the court found Logistics liable for the loans it received from plaintiff under the Notice of Termination and the Letter of Understanding, the court found Black personally liable to plaintiff for the loans made by plaintiff to Logistics pursuant to the Guaranty Agreement.[5]

The Guaranty Agreement provides in pertinent part as follows:

> D.      As a material inducement to the Company (Centrix HR, LLC) to enter into the [Master Factoring] Agreement and the Licensing Agreement, which is incorporated herein by reference, Guarantor (collectively, Logistics and Black), subject to certain limitations set forth hereafter, agrees to irrevocably and unconditionally guaranty all of the Company's obligations pursuant to and/or arising out of and pursuant to [sic] the Licensing Agreement.

> 1.      Guaranteed Obligations.  All obligations of Guarantor set forth in this Section 2 [sic] are collectively called the "Obligations".

> a.      Guaranty.  Guarantor guarantees the performance and payment of all of the obligations **of the Company under the Licensing Agreement**, which is incorporated herein by reference, (the "Obligations").  . . .

(Guaranty Agreement ¶¶ D, 1 (emphasis added).)

Upon further review, the court finds that the plain and unambiguous terms of the Guaranty Agreement provide that Black guaranteed obligations of plaintiff pursuant to or arising

---

[5]      Contrary to plaintiff's assertion, the court did not find Black personally liable for the loans plaintiff made to Logistics pursuant to the Notice of Termination or the Letter of Understanding.  Those documents provide a basis for finding Logistics liable to plaintiff for the loans.

out of the Licensing Agreement, not obligations of Logistics to plaintiff.  Accordingly, the court

will amend its conclusions of law and conclude that Black is not personally liable for loans made

to Logistics by plaintiff.

        The court rejects plaintiff's argument that defendants' interpretation of the plain

language of the Guaranty Agreement leads to the self-serving result that Logistics and Black

guaranteed only obligations of plaintiff to Logistics, as the only two parties to the Licensing

Agreement.  (Pl.'s Resp. at 15-18.)  Clearly, plaintiff in the operation of its business incurred

expenses and could owe obligations to third parties which would be covered by the Guaranty

Agreement, subject to any and all limitations set forth in the Agreement.

        Plaintiff urges that defendants waived the argument that Mr. Black did not agree

to repay plaintiff's loans to Logistics under the Guaranty Agreement because defendants did not

raise it earlier.  Plaintiff's argument must fail as contrary to the facts in this case.  Plaintiff is

correct that it argued from the beginning of these proceedings that Black and Logistics were

liable under the Guaranty Agreement for repayment of plaintiff's loans to Logistics.  In the

Complaint, plaintiff asserted that: "On even date therewith the Defendant Black and Defendant

Logistics also entered into a Guaranty whereby they, among other things, guaranteed the

performance and payment of Defendant Logistics' obligations under the Licensing Agreement."

(Complaint ¶ 9.)[6]  At the trial, plaintiff argued that defendant Black was liable for repayment of

plaintiff's loans to Logistics under the Guaranty Agreement.  In its Proposed Findings of Fact

and Conclusions of Law, plaintiff argued that "Black and Logistics also signed a Guaranty

---

      [6]     In their Answer, defendants denied this allegation stating that the document
speaks for itself.  (Doc. No. 12.)

whereby Black, among other things, personally guaranteed both the 'performance' of and 'payment' of all of Logistic's obligations under the Licensing Agreement."  (Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 26.)

While defendants did not argue the language of the Guaranty Agreement as clearly at trial as they do now, review of the record reveals that defendants have consistently argued that the language of the Guaranty Agreement speaks for itself.  See N.T., 10/22/07 at 41 (defense counsel stated during opening argument, "The guarantee did go along with [the] licensing agreement and you'll see language in there that says that my client would guarantee costs and expenses that arose from the operation of the licensing agreement.  You know, at the end of the day, that's really the phrase that this case is about."); Defs.' Proposed Findings of Fact and Conclusions of Law ¶ 29 ("The Guaranty Agreement . . . provided that Logistics and Mr. Black would guarantee [plaintiff's] obligations 'pursuant to and/or arising out of . . . the Licensing Agreement."); Defs.' Post Trial Brief at 1 (In the Guaranty Agreement, Logistics and Mr. Black "agreed to guarantee the obligations of HR, which 'arose out of' or were 'pursuant to' the terms of the Licensing Agreement."); Defs.' Post Trial Brief at 12, 14-15 (same).[7]  The plain language

---

[7]     Plaintiff contends that defendant Black acknowledged that he agreed to repay the loans to Logistics.  See Pl.'s Resp. to Defs.' Post Trial Brief at 2-3 (citing Defs.' Post Trial Brief at 13 and Exs. P-10, P-16).  In defendants Post Trial Brief, defense counsel stated as follows: "Mr. Black acknowledges that he agreed to repay loans to Logistics if Mr. Mazzoni could demonstrate such a claim.  Mr. Mazzoni never provided such documentation."  (Defs.' Post Trial Brief at 13.)  No evidence in the record supports counsel's statement that Mr. Black personally agreed to repay loans from plaintiff to Logistics.  Mr. Black did not so testify.  The plain language of the Guaranty Agreement provides otherwise.  Moreover, it is unclear what time frame defense counsel was referring to in the Post Trial Brief or what set of conditions was or had to be in place as consideration for such a promise by Mr. Black.  Exhibits P-10 and P-16 do not support plaintiff's argument that Mr. Black personally agreed to repay loans from plaintiff to Logistics.  Exhibit P-10, the LOU, is between plaintiff and Logistics and signed by Mr. Black as President of Logistics.  Exhibit P-16 is the Notice of Termination to plaintiff from Logistics and

of the Guaranty Agreement supports defendants' position that Mr. Black did not personally guarantee the repayment of plaintiff's loans to Logistics.

The court admits that initially it was under the impression that the parties agreed that Black accepted personal liability to pay obligations of Logistics under the Guaranty Agreement.  The court now realizes that defendants did not.  Some of the confusion stems from the trial where the distinction between Mr. Black and his company, Logistics, both defendants in this matter, blurred.  Mr. Black was the President of Logistics.  During the trial, counsel often referred to Mr. Black personally when meaning to refer to Logistics.  See, e.g., N.T., 10/23/70 at 266 (during Black's direct testimony, counsel referred to "you," but corrected himself to reflect that he meant Logistics); N.T., 10/24/07 at 57 (defense counsel clarified during Black's direct testimony, "Yours meaning Logistics, right?"); id. at 66 (discussing the LOU, Black refers to himself repaying alleged loans to plaintiff when, without dispute, the document is between plaintiff and Logistics).  Regardless, the language of the Guaranty Agreement is clear.  Mr. Black did not agree to be personally liable as a guarantor for repayment of plaintiff's loans to Logistics. For the above reasons, defendants' Motion is granted in part and  the court will amend its Findings of Fact and Conclusions of Law to conclude that Mr. Black is not personally liable for repayment of plaintiff's loans to Logistics.

---

also signed by Mr. Black as President of Logistics.  In neither of these documents did Mr. Black accept personal liability to repay plaintiff's loans to Logistics.

III.  **PLAINTIFF'S MOTION**

    1.    **Logistics' Damages**

        Plaintiff argues that Logistics' only counterclaim properly pled was for unpaid commissions under the Licensing Agreement.  Plaintiff asserts that at trial, however, defendants abandoned this counterclaim and replaced it with a new theory seeking repayment of an alleged loan of receivables from Logistics to plaintiff used by plaintiff as seed money for the business.  (Pl.'s Mem. of Law at 2-3.)  Since the court rejected the counterclaim seeking the repayment of the loan of receivables, and defendants allegedly abandoned their original counterclaim, plaintiff urges that defendants should have recovered no damages in this litigation.  Plaintiff further argues that the court erred in awarding Logistics damages in the amount of $1,603,673.00.  Plaintiff contends that Logistics never requested damages in this amount but, rather, sought damages in the amount of $505,965.00.  (Pl.'s Mem. of Law at 4-5.)

        First, the court rejected defendants' late added counterclaim regarding the loan of receivables as untimely presented and as meritless.  See MOD, 2008 WL 783558, at *21.  Second, defendants clearly pled a counterclaim alleging that plaintiff failed to pay to Logistics all sums due and owing under the Licensing Agreement.  See Answer with Counterclaims ¶¶ 5-26 (Doc. No. 12.)  Plaintiff contends that defense counsel, Mr. Gerber, abandoned this counterclaim when he admitted in his opening argument that "all commissions due [under the Licensing Agreement] were paid 'as per the agreement.'" (Pl.'s Mem. of Law at 4 (citing N.T., 10/22/07 at 39).)  Plaintiff mischaracterizes the statements of Mr. Gerber.  Review of the Notes of Testimony reveals a different argument by Mr. Gerber.  Discussing the business of plaintiff and plaintiff's interaction with defendants under the Licensing Agreement, the following colloquy took place:

11

| | |
|---|---|
| THE COURT: | Were they [defendants] paid money by Mr. Mazzoni's company for that? |
| MR. GERBER: | Yes.  Yes. |
| THE COURT: | Okay.  Then, were they paid commissions as . . . as the – |
| MR. GERBER: | As per the agreement. |
| . . . | |
| THE COURT: | So the counterclaim is only limited to this initial capital investment, I'll call it – |
| MR. GERBER: | Essentially. |
| . . . | |
| MR. GERBER: | It's . . . a little complicated on its face, but I submit that once we go through the testimony, Your Honor is going to see a much different version of what's going on here.  We have an integrated contract that we're going to submit, Your Honor. |

(N.T., 10/22/07 at 39-40.)  Defense counsel did not admit that <u>all</u> commissions had been paid

pursuant to the Licensing Agreement.  Mr. Gerber stated that commissions were to be paid

pursuant to the Licensing Agreement.  Mr. Gerber did not state that the counterclaim was limited

to the loan of receivables, but urged the court to wait for the evidence, which Mr. Gerber stated

included an integrated contract – the Licensing Agreement.  Defendants presented evidence at

trial of the amount of commissions due Logistics from plaintiff under the Licensing Agreement.

<u>See, e.g.</u>, N.T, 10/24/07 at 293.

> After hearing the evidence, the court concluded as follows:
>
> Defendant, Logistics, has asserted a Counterclaim against plaintiff for fees owed to it pursuant to the Licensing Agreement.  <u>See</u> Answer with Counterclaims ¶¶ 8-25.
>
> Plaintiff's books of original entry record a net due to Logistics for fees of $1,603,673, as of August 31, 2003, the last date for which financial statements were prepared.  (Ex. D-50 (Report of C. Lunden) at 4 and Ex. B; N.T., 10/23/07 at 176; Ex. D-69.)  Thus, in the absence of any offset, judgment should be entered in favor of defendant, Logistics, and against plaintiff, HR, in the amount of $1,603,673 which plaintiff's own records show is owed to Logistics.

(MOD, 2008 WL 783558, at *20.)

This court is aware that defendants stated the amount of their damages as $505,965.00 in their Proposed Findings of Fact and Conclusions of Law.  See Defs.' Proposed Findings of Fact and Conclusions of Law ¶¶ 4, 5.  However, defendants' submission to the court is not evidence.

As also pointed out by defendants in their Findings of Fact and Conclusions of Law, defendants' expert, Mr. Lunden, calculated the amount owed Logistics by plaintiff as $1.6 million.  (Defs.' Findings of Fact and Conclusions of Law ¶ 169.)  Christopher Nawn, CPA, plaintiff's expert witness, did not dispute that figure.  Id.  During his testimony, Mr. Lunden explained that plaintiff's books of original entry and the books and records of Logistics both show an amount due from plaintiff to Logistics of $1.6 million.  See N.T., 10/24/07 at 193.  Mr. Lunden later testified that the amount due Logistics from plaintiff was $505,965.00, but qualified that answer by stating that he arrived at that figure if "you take everything into account and if you accept the arguments in the counterclaim and if you find liability."  Id. at 194.  It is unclear what had to be taken "into account" to arrive at the $505,965.00 figure.  It is unclear which counterclaim Mr. Lunden referenced, the rejected receivables counterclaim or the originally pled counterclaim for amounts due Logistics under the Licensing Agreement.

The court later asked defense counsel whether the amounts owed to Logistics by plaintiff should be offset by the $505,000.  Id. at 278.  Defense counsel replied as follows: "You offset it by a million six, which is what - - in Exhibit B it actually shows you the net, the net amount due to defendant."  Id. at 278, 290.  The court confirmed by stating: "All right.  So you are saying, if you took the seven thirty-six, you are saying it should be offset by the 1.3?"[8]  Id. at

---

[8]     The court appears to have misstated "$1.6 million" and "1.3."

278. Defense counsel replied, "Yes." Id.[9]  See also Defs.' Supplemental Post Trial Brief at 3

(offset amount equals $1.6 million, the amount due Logistics from HR).

This court properly exercised its function as fact finder and considered the weight

of the evidence presented, which included plaintiff's own books of original entry, and testimony

of the parties' expert witnesses.  The court also engaged in lengthy colloquies with counsel

regarding the issue of damages.  After conducting a thorough analysis, this court concluded that,

after appropriate offset, plaintiff owes to Logistics the amount of $737,673.70[10].  The record

clearly supports this court's conclusions regarding damages.  Plaintiff's disagreement with this

court's conclusion is insufficient to warrant granting of plaintiff's Motion.

### 2.      Loans to Transit Aide

Plaintiff contends that the court erred when it limited the recovery for loans from

plaintiff to Transit Aide, Inc.[11] ("Transit Aide").  (Pl.'s Mem. of Law at 16.)  This court

concluded as follows:

> The court finds Mr. Mazzoni's testimony credible that numerous loans were made
> from HR directly to Transit Aide and that Mr. Black, on behalf of Logistics,

---

[9]      Plaintiff argues that the court erred when it relied upon Exhibit B to the expert
report of Mr. Lunden (Ex. D-50), defendants' expert, as opposed to Exhibit A.  (Pl.'s Mem. of
Law at 11-12, 11 n. 1.)  Plaintiff urges that Exhibit A is the analysis of operating results while
Exhibit B was only a "factor" in favor of Mr. Lunden's argument that Logistics was not the cause
of plaintiff's inability to pay its taxes.  Id. at 11 n.1.  The court has reviewed Exhibit D-50.
Exhibit A to Exhibit D-50 is titled "Adjusted Income Statements," and Exhibit B is titled "Net
Amount Due to Defendant."

[10]      In the MOD, the court concluded that plaintiff owes Logistics $737,673.70.  The
correct amount is $737,673.64 ($1,603,673.00 – $865,999.36).  Plaintiff has not objected to this
six cents discrepancy.  Since this is not a material amount, the court will not amend the Judgment
Order.

[11]      Transit Aide is a company owned by defendant Black.

agreed to repay the loans.  By clear, precise and convincing evidence, plaintiff has shown that Logistics agreed to repay these loans because it needed Transit Aide in operation because it transported employees of Logistics to clients during work hours.  (N.T., 10/22/07 at 97-98, 210.)

(MOD, 2008 WL 783558, at *12.)  The amount of the loans from plaintiff to Transit Aide totaled $142,897.81.  Id. at 20.

Plaintiff urges that the court erred when it did not include loans that allegedly went to Transit Aide that first passed through Employers Management Group, Inc. ("EMG"), a company owned by Black's former business partner, Robert Brown.  (Pl.'s Mem. of Law at 16.) The court addressed this issue in detail in the MOD.  See MOD, 2008 WL 783558, at *14.  The court found, and there is no dispute, that effective April 1, 2001, Black relinquished his ownership interest in EMG to Brown who thereafter retained full ownership of EMG.  (MOD, 2008 WL 783558, at *3.)  The testimony at the trial revealed that approximately $2,455,822 was transferred from plaintiff to EMG.  Id. at *7-*8.  In rejecting plaintiff's claim for reimbursement for these amounts, the court concluded as follows:

> After careful consideration of the evidence, this court concludes that neither Mr. Black nor Logistics are liable for the loans made by HR to EMG.  Plaintiff has failed to prove by a preponderance of the evidence, let alone by clear precise and convincing evidence, that Mr. Black ever knew of these loans to EMG at the time they were made or subsequently agreed to repay the loans.
>
> The letters sent by Mr. Mazzoni to Mr. Black discussed above did not reference any loans to EMG.  While Mr. Mazzoni did reference loans made to Transit Aide and Logistics, he was silent as to any agreement by Mr. Black to pay loans to EMG. . . . This court finds it incredible that Mr. Black would agree orally to repay loans incurred by EMG, a company owned exclusively by Mr. Brown at the time of the alleged loans. . . .
>
> In his testimony, Mr. Mazzoni explained that HR made loans to EMG as part of its effort to assist Transit Aide, because EMG was responsible for funding the payroll of Transit Aide employees.  (N.T., 10/22/07 at 75, 85.)  EMG would pay

15

Transit Aide's payroll each week, and EMG would bill Transit Aide for the amounts of the payroll.  Transit Aide was to pay the invoice to EMG.  (N.T., 10/23/07 at 120-21.)  . . .  Mr. Black credibly testified that Transit Aide paid most, if not all, of these invoices.  (N.T., 10/24/07 at 158-62.)  Plaintiff did not introduce any billing records of EMG, or unpaid invoices and dunning letters EMG sent to Transit Aide, to support Mr. Mazzoni's assertion that the monies transferred from HR to EMG went directly to pay Transit Aide's payroll, and that Transit Aide did not repay the monies.  See N.T., 10/23/07 at 207-09.  HR's accounting records show transfers to EMG, but do not describe the reasons for the transfer.  (Exs. P-31, P-32.)  Plaintiff has not eliminated the possibility that the loans from HR to EMG were used for other purposes, for example, to pay another client's payroll.  EMG had many clients, only one of whom was Transit Aide.  (N.T., 10/23/07 at 118-19, 276.)  Even if the loans from HR to EMG were used to pay Transit Aide's payroll, this court cannot impose on Logistics or Mr. Black the obligation to repay HR for these loans absent credible evidence proving that they agreed or promised to repay HR for loans to EMG.

(MOD, 2008 WL 783558, at *14 (footnote omitted).)

In the instant Motion, plaintiff rehashes the same arguments raised at trial regarding the loans from HR to EMG.  The court addressed the evidence presented at trial.  See MOD, 2008 WL 783558, at *14 and *14 n.2.  The court discussed plaintiff's claim of unjust enrichment.  Id. at *14 n.3.  The court considered the various letters Mr. Mazzoni sent to Mr. Black concerning Transit Aide.  Id. at *12-*13.  Plaintiff argues that the testimony of its expert, Christopher Nawn, proves that the monies lent by plaintiff to EMG were used for Transit Aide.  (Pl.'s Mem. of Law at 17.)  However, Mr. Nawn's testimony was not as persuasive as plaintiff paints.  On cross-examination, Mr. Nawn testified as follows:

> Q.   Do you know - - you don't know why monies in that amount would be transferred to EMG, do you?
>
> A.   No.  I was not employed by either Mr. Black or Mr. Mazzoni.
>
> Q.   So, all you see in these bank statements over a thirty-two month period is that amount of money going to EMG?
>
> A.   I see transfers going to EMG bank accounts consistent with payroll dates, consistent with the disbursement dates so, you know, it's money sent over there to - -

16

> Q.     Right.  But you don't know why?
> A.     That's correct.

(N.T., 10/23/07 at 204.)  Discussing the loans to EMG, Mr. Nawn testified on direct examination

that monies lent to EMG was "cash that went out to defendants' companies or related entities,"

not only to Transit Aide.  Id. at 178.  Mr. Nawn also testified that the transfers "coincided with

payroll dates so . . . it passed the smell test in terms of where was the money going and why it

was going out."  Id. at 192.  Passing the "smell test" is hardly persuasive evidence.[12]

Defendants' expert, Mr. Lunden, testified as follows regarding the transfers of

monies from plaintiff to EMG and Mr. Nawn's expert report:

> [Mr. Nawn] is looking at the total transfers over a thirty two month period,
> transfers to EMG and saying that they belong as an offset, and in my opinion that
> would only be appropriate if one of the Black entities got the benefit of those
> transfers.
>
> I saw a document in the production that indicated that EMG was a hundred
> percent owned by Mr. Brown, so I don't think it is appropriate to attribute all of
> the transfers to EMG as benefitting Mr. Black.

---

[12]     Plaintiff mischaracterizes the evidence when it states that Mr. Nawn "reviewed
EMG's bank statements and, from those statements, he verified 'to the penny', the subsequent
transfer of those same amounts to Transit Aide."  (Pl.'s Mem. of Law at 17.)  Mr. Nawn testified
as follows:

> For example, if you look at the EMG loan balance there of 2.5 million dollars we
> just didn't take it for granted that it went up by six hundred and eighty-five
> thousand dollars.  We went and grabbed the bank statements from Mr. Mazzoni's
> companies, and the bank statements for Mr. Black's company, EMG, and verified
> the numbers to the penny.

(N.T., 10/23/07 at 188.)  In this testimony, Mr. Nawn did not state that he traced the monies
loaned to EMG to Transit Aide "to the penny."  Mr. Nawn testified that by looking at EMG bank
statements and the bank statements of Mr. Mazzoni's companies, he was able to trace the monies
going from "Mr. Mazzoni's companies" into EMG "to the penny."

(N.T., 10/24/07 at 197.)  The record supports this court's conclusion that defendants are not liable for repayment of loans plaintiff made to EMG.  Plaintiff's request that the court reconsider defendants' duty to repay loans from plaintiff to EMG is denied.

### 3.    Equitable Offset, Recoupment, and Harm to Third Party Creditors

Plaintiff's third and fourth arguments are as follows:

Assuming, Arguendo, that Logistics' [sic] was Entitled to an Award of any Amount on its Counterclaims, the Court Overlooked the Record When It Allowed Black and Onsite to have the any of [sic] Benefit of an Equitable Offset or Recoupment for any Damages Awarded Under Logistics' Counterclaims Because They Neither Pled nor Presented any Counterclaims

Assuming, Arguendo, that Black and On-Site were Entitled to Equitable Recoupment on Account of a Counterclaim that they neither Pled nor Presented, Equitable Recoupment should still not be Applied Because it Unjustly Harms the Rights of Third Party Creditors

(Pl.'s Mem. of Law at 20, 22.)  Plaintiff contends that assuming Logistics is entitled to damages on account of its counterclaims, Black and On-Site should not be able to use those damages to offset any of their joint and several liability because they did not present any counterclaims on behalf of themselves.  Id. at 20.  Plaintiff further argues that if Black and On-Site are otherwise entitled to equitable recoupment, it should nonetheless be denied because application of equitable recoupment unjustly harms the rights of third party creditors, namely, the Internal Revenue Service, the Commonwealth of Pennsylvania and plaintiff's counsel.  Id. at 23-25.

These claims will be denied.  This court has amended its Conclusions of Law to conclude that defendant Black did not guarantee repayment of plaintiff's loans to Logistics under the Guaranty Agreement.  Since Black is not liable as guarantor for repayment of Logistics' obligations to plaintiff, the doctrines of setoff and equitable recoupment do not apply as to Black.

The court concluded in the MOD that On-Site, as the successor corporation to Logistics, was liable to plaintiff for the amounts plaintiff loaned to Logistics.  (MOD, 2008 WL 783558, at *20 and *20 nn.6 and 7.)  On-Site, as successor to Logistics, is obligated to pay only that amount owed by its predecessor, Logistics.  Logistics is entitled to offset the money it owes plaintiff against the money owed to Logistics by plaintiff.  See id.  On-Site is liable only for the net amount, if any, after application of offset.

It is ironic that plaintiff argues that defendants should be denied offset because the unpaid taxing authorities are unjustly harmed parties.  The taxing authorities were harmed due to plaintiff's own actions.  Defendants should not be deprived of their right to offset because of plaintiff's actions.  The authority cited by plaintiff does not require otherwise.  Further, plaintiff contends that its attorneys may have a charging lien on a fund created by the lawsuit.  No fund was created by the lawsuit; defendants owe nothing to plaintiff other than one dollar for violation of the non-compete provision of the Licensing Agreement.  Plaintiff's claims are denied.

**4.      Plaintiff's Request for an Accounting**

Next, plaintiff contends that the court erred when it denied Count II of its Complaint requesting an accounting.  (Pl.'s Mem. of Law at 26-29.)  In Count I of the Complaint, plaintiff alleged a claim of "Intentional Interference with Contractual Relations."  (Complaint Count I.)  In Count II of its Complaint, plaintiff incorporated paragraphs one through forty-four of the Complaint and requested an accounting.  (Complaint Count II.)  In Count II, plaintiff alleges as follows:

> Solely as a result of the conduct of the Defendants as set forth above, Plaintiff is entitled to an accounting to it for all sums received by Defendants and to have remitted to it all such sums received without reduction, and to have Defendants

19

cease and desist from their tortious interference with Plaintiff's contractual
relations.

(Complaint ¶ 46 (emphasis added).)  Plaintiff's request for an accounting related solely to

plaintiff's claim in Count I of the Complaint alleging intentional interference with contractual

relations.  Id.  The court denied Count I of the Complaint and the related request for an

accounting concluding as follows:

> In Count II of the Complaint, plaintiff requests an accounting for all sums
> received by defendants as a result of their tortious interference with plaintiff's
> contractual relations.  (Complaint ¶ 46.)  Since plaintiff has failed to prove that
> defendants tortiously interfered with plaintiff's contractual relations, this court
> will not order an accounting.
>
> Furthermore, "[a]n accounting request is not a substitute for plaintiffs' obligation
> to establish their damages through discovery."  Arrowroot Natural Pharmacy v.
> Stand. Homeopathic Co., 1998 WL 57512 (E.D. Pa. Feb. 10, 1998).  "An
> accounting should not be used to aide [sic] a party who otherwise failed to satisfy
> his burden of proof on the damages issue."  Genica, Inc. v. Holophane Div. of
> Manville Corp., 652 F. Supp. 616, 619-20 (E.D. Pa. 1987).  See also United States
> v. Kithcart, 134 F.3d 529, 536 (3d Cir. 1988) (McKee, J., dissenting in part and
> concurring in part) ("I do not think it is asking too much to expect attorneys to
> attempt to meet their burdens of proof when issues are first litigated.").  Plaintiff
> had the opportunity through discovery to establish any damages caused by
> defendants' alleged interference with contractual relations.  Plaintiff evidently
> failed to conduct discovery to establish its damages resulting from defendants'
> interference with contractual relations, and offered no such evidence at trial.
> Accordingly, an accounting will not be ordered by this court.

(MOD, 2008 WL 783558, at *17.)

_____Plaintiff did not request an accounting with respect to any other count of the

Complaint.  To the extent that plaintiff's incorporation of Count II into the later Counts of the

Complaint is sufficient to transform plaintiff's specific request for an accounting with respect to

Count I into a general request for an accounting for all Counts of the Complaint, or most

particularly for plaintiff's claim that defendants breached the non-compete provision in the

20

Licensing Agreement, the court denies plaintiff's request for reconsideration.  The same analysis

quoted above would apply.  Attached as Exhibit A to plaintiff's Motion, is a Declaration of

Blaise Mazzoni dated April 1, 2008, in which he declares: "[T]he Plaintiff specifically asked

Defendants during discovery, and again in connection with trial, to produce the documents

necessary to prepare such calculations.  The Defendants refused to comply."  (Pl.'s Mem. of Law

Ex. A.)  Attached to the Declaration are plaintiff's first set of document requests dated January

31, 2006 and plaintiff's notice to produce for the trial dated October 19, 2007.  The record is

devoid of any action taken by plaintiff after January 31, 2006 but before the trial to obtain the

documents defendants allegedly refused to provide.  The court reviewed the docket in this case

and plaintiff did not file a motion to compel, or take any other action to obtain discovery needed

to establish its damage claim.  See Fed. R. Civ. P. 37.  Mr. Mazzoni's post trial Declaration is too

little, too late.

        Plaintiff's request for an accounting must be denied since plaintiff had an

adequate remedy at law – a claim for damages.  Arrowroot Natural Pharmacy v. Stand.

Homeopathic Co., 1998 WL 57512, at *12 (E.D. Pa. Feb. 10, 1998).  See also Am. Air Filter Co.,

Inc. v. McNichol, 527 F.2d 1297, 1300 (3d Cir. 1975) ("An accounting is an essentially equitable

remedy. . .."); Pennsylvania Ship Supply, Inc. v. Fleming Int'l, Ltd., 113 F. Supp. 2d 760, 764

(E.D. Pa. Sept. 11, 2000) ("An accounting is an equitable remedy which is available only when

there is no adequate remedy at law.").  Where a party had the opportunity to establish their

damage claim through discovery, a request for an accounting is not appropriate.  Pennsylvania

Ship Supply, 113 F. Supp. 2d at 764.  "An accounting request is not a substitute for plaintiffs'

obligation to establish their damages through discovery."  Arrowroot, 1998 WL 57512, at * 12.

Here, plaintiff had an adequate remedy at law and cannot resort to the equitable remedy of an

accounting.  Plaintiff's motion for reconsideration on its request for an accounting is denied.

**5.**      **Use of "Centrix" Name**

Plaintiff contends that the court erred when it concluded that defendants had the

right to use the "Centrix" name.  (Pl.'s Mem. of Law at 29-32.)  Plaintiff urges that defendants

failed to satisfy all of the requirements of paragraph 18 of the Licensing Agreement and,

therefore, cannot use the "Centrix" name and brand.  The court concluded as follows:

> The Licensing Agreement provided that upon the termination of the agreement,
> the name "Centrix HR" and logo would transfer to Logistics for consideration of
> one dollar.  (Ex. P-2 ¶ 18.)  This court has held that Logistics properly terminated
> the Licensing Agreement. . . .  Thus, upon the termination, Logistics had the right
> to use the name HR and logo.  Therefore, defendants did not engage in unfair
> competition.

(MOD, 2008 WL 783558, at *19.)

Paragraph 18 of the Licensing Agreement is subtitled "Term" and provides a

number of requirements and conditions governing the Licensing Agreement.  Paragraph 18

provides as follows:

> **Term.**  The Initial Term of this Agreement shall begin on the effective date
> specified above and shall continue for a period of at least one (1) year and/or until
> terminated by either party as permitted by the Agreement upon prior written
> notice.  Upon the death or the incapacitating disability of Blaise Mazzoni . . .,
> Licensee shall assume the responsibility of Licensor to fulfill its obligations
> hereunder until the end of the Term of this Agreement at no fee.  At the end of the
> Term or upon termination of this Agreement, Licensor hereby sells assigns and
> transfers the Name unto Licensee in consideration for $1.00.  At the end of the
> Term of this Agreement . . ., Licensee agrees to enter into an Administrative
> Services Agreement with Licensor upon terms and conditions consistent with the
> services provided to the Licensee under this agreement, and at the same fee and
> reimbursed expense structure for a term of at least an additional one year. . . .

(Licensing Agreement ¶ 18.)  Plaintiff argues that because Logistics[13] did not enter into an Administrative Services Agreement with plaintiff, Logistics did not fulfill the requirements for the use of the Centrix name.

Paragraph 18 of the Licensing Agreement permits Logistics to use the Centrix name upon the end of the term or upon termination of the agreement in consideration of $1.00. The execution of the Administrative Services Agreement is a separate and independent requirement under paragraph 18.  The plain language of the Licensing Agreement does not make execution of the Administrative Services Agreement a condition precedent to Logistics' use of the Centrix name.  If plaintiff desired to bring a claim against Logistics for breach of this separate requirement, it could have done so.  Plaintiff did not.  Plaintiff's request that the court reconsider its conclusion that Logistics has the right to use the HR name is denied.

6.    **Attorney's Fees Under the Guaranty Agreement**

Plaintiff contends that the court overlooked plaintiff's claim for attorney's fees under the Guaranty Agreement.  (Pl.'s Mem. of Law at 32.)  Plaintiff argues that it is entitled to attorney's fees for successfully enforcing the Guaranty Agreement against Black as guarantor of Logistic's obligations.  Paragraph twenty-four of the Guaranty Agreement provides as follows:

> Attorney's Fees.  Guarantor will pay all of the Company's reasonable costs, charges, and expenses, including court costs and attorneys' fees, incurred in enforcing Guarantor's obligations under this Guaranty.

(Ex. P-3 ¶ 24.)  This request is now moot.  The court has amended its Conclusions of Law to conclude that Black is not liable under the Guaranty Agreement for repayment of plaintiff's loans

---

[13]    Plaintiff specifically argued that Black's use of the Centrix name is improper under the Licensing Agreement.  However, since Logistics is the Licensee under the Licensing Agreement, the defendant allegedly misusing the name is Logistics.

23

to Logistics.  Plaintiff has not enforced the obligations of either of the Guarantors under the

Guaranty Agreement.  Hence, plaintiff cannot seek attorney's fees under the Guaranty

Agreement.  Plaintiff's request for attorney's fees under the Guaranty Agreement is denied.

## IV.    CONCLUSION

For the reasons stated above and in the MOD, the court finds that defendant

Logistics is liable to plaintiff for loans in the amount of $856,999.36.  This amount shall be

offset by amounts HR owes to Logistics – $1,603,673.  On-Site, as the successor corporation, is

merely a continuation of Logistics and is therefore liable for its debts.  Black is not liable under

the Guaranty Agreement for Logistics' obligations to plaintiff.  However, Black remains liable

for damages in the amount of $1.00 for breach of the non-compete provision of the Licensing

Agreement.

The court's Conclusions of Law in the MOD are revised as follows:

1.    The first sentence of paragraph one is amended to read as follows: "It is

clear that Logistics agreed in writing to repay any loans between HR and Logistics."

2.    The last sentence of paragraph one is amended to read as follows: "Thus,

this court concludes that defendant Logistics is liable to plaintiff for loans made to Logistics

pursuant to the Licensing Agreement."

3.    Reference to defendant Black being liable as guarantor is deleted from

Section III.

The court need not amend the Judgment Order since the rulings herein do not materially affect the Judgment Order entered by the court on March 25, 2008.  An appropriate order follows.

BY THE COURT:

/s/  Thomas J. Rueter
THOMAS J. RUETER
Chief United States Magistrate Judge

25