IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTRIX HR, LLC | : | CIVIL ACTION |
| v. | : | |
| ON-SITE STAFF MANAGEMENT, INC. d/b/a/ CENTRIX STAFFING, et al. | : | NO. 04-5660 |

### MEMORANDUM OF DECISION

THOMAS J. RUETER  April 20, 2010
Chief United States Magistrate Judge

This Memorandum of Decision addresses the calculation of counterclaim plaintiff's damages after remand by the Third Circuit Court of Appeals. <u>Centrix v. On-Site Staff Management, Inc.</u>, Nos. 08-2834 & 08-2984 (3d Cir. Oct. 19, 2009).

## I. TRIAL COURT – PROCEDURAL HISTORY

The court conducted a bench trial in the above-captioned case from October 22 to October 24, 2007. Thereafter, the court issued a Memorandum of Decision dated March 25, 2008 (the "March 2008 Opinion"). The court entered judgment in favor of plaintiff Centrix HR, LLC ("HR") and against defendants, On-Site Staff Management, Inc. ("On-Site"), Centrix HR Logistics, Inc. ("Logistics") and William Black, as guarantor, jointly and severally, on Count 6 of the Complaint in the amount of $865,999.36. The court also entered a judgment on Count 6 of the Complaint in favor of plaintiff HR in the amount of $1.00 for the breach of the non-compete clause of the Licensing Agreement. On the remaining counts of the Complaint, judgment was entered in favor of defendants and against HR. <u>See</u> March 2008 Opinion.

Defendant Logistics asserted numerous counterclaims against plaintiff (the "Counterclaims").  The court entered judgment in favor of Logistics and against HR on Counts 1 and 2 of the Counterclaims (Breach of Contract and Conversion) in the amount of $1,603,673, to be offset by the $865,999.36 judgment against Logistics and in favor of plaintiff, for a balance of $737,673.70, plus pre-judgment interest.[1]  Judgment was entered in favor of HR and against Logistics on Count 3 of the Counterclaims (Accounting).  See March 2008 Opinion.

Thereafter, plaintiff filed a Motion for Reconsideration, and/or for a New Trial or to Correct, Amend or to Supplement the Court's March 25, 2008 Order and/or to Make Additional or Supplemental Findings of Fact (Doc. No. 53).  Defendants filed a Motion for Relief Pursuant to Federal Rules of Civil Procedure 52, 59 and 60 (Doc. No. 54).  The parties filed various briefs in support of and in opposition to the motions.  The court issued a second Memorandum and Order dated June 3, 2008 (the "June 2008 Opinion").  For the reasons stated in the March 2008 Opinion and the June 2008 Opinion, this court found that Logistics is liable to plaintiff for loans in the amount of $865,999.36, which amount shall be offset by amounts plaintiff owes to Logistics in the amount of $1,603,673.  The court also found that defendant On-Site, as the successor corporation, is merely a continuation of Logistics and therefore is liable for its debts.  The court revised its prior judgment and concluded that defendant Black is not liable under the Guaranty Agreement for Logistics' obligations to plaintiff.  However, defendant Black

---

[1] In this court's Memorandum and Order dated June 3, 2008, the court noted that the correct amount owed Logistics by HR was $737,673.64 ($1,603,673.00 - $865,999.36). However, because plaintiff did not object to the six cents discrepancy and because the difference is not material, the court declined to amend the judgment order.  (June 2008 Opinion at 14 n.10.)

remained liable for damages in the amount of $1.00 for breach of the non-compete provision of the Licensing Agreement.² See June 2008 Opinion.

## II. THIRD CIRCUIT COURT OF APPEALS – REMAND

Thereafter, plaintiff appealed various aspects of this court's order, and defendants cross-appealed on one issue. Centrix v. On-Site Staff Management, Inc., Nos. 08-2834 & 08-2984, slip op. at 2 (3d Cir. Oct. 19, 2009) (the "Third Circuit Opinion"). The Third Circuit Court of Appeals affirmed on all issues except as to the calculation of the award of counterclaim damages, which the Third Circuit Court of Appeals remanded for further consideration. Id.

The Third Circuit Court of Appeals stated as follows with respect to this court's award of counterclaim damages to Logistics and its mandate on remand.

> HR argues that the Magistrate Judge clearly erred when he awarded approximately $1.6 million to Logistics on its counterclaim, representing the net amount due to Logistics based on HR's own books. HR does not appear to dispute that its books showed that it owed Logistics a net amount of $1.6 million at the conclusion of the parties' relationship. It argues, however, that the correct amount of damages should have been $505,965, because, at various points in the litigation, Defendants made clear that they were seeking only $505,965 in damages on the counterclaim.
>
> Defendants' expert testified at trial that the total amount owed to Logistics was $1.6 million, but he also testified, almost immediately thereafter, that $505,965 was "the amount that would be required to restore [Logistics] to the financial position it otherwise would have been in, had there been no breach that is alleged in the counterclaim" – "the amount due to Logistics from [HR] ...." (App. at 229.) Moreover, while the $1.6 million figure is listed as "net amount due [Logistics]" in Exhibit B to the expert's rather sparse report, Exhibit A to that report lists $505,965 as the "Total Net Amount Due [Logistics]." (Id. at 107-08.) Defendants also argued for $505,965 in their Proposed Findings of Fact and

---

² The court has summarized herein its findings of fact and conclusions of law set forth in detail in the March 2008 and the June 2008 Opinions. Reference is made to the March 2008 and the June 2008 Opinions for the court's full statement of its findings of fact and conclusions of law.

3

> Conclusions of Law and post-trial brief (although, at another point in the brief, they stated that the total amount owed by HR to Logistics was $1.6 million and that any award to HR should be offset by this amount), and counsel summarized the counterclaim to the Magistrate Judge saying "my client is out a half of a million bucks." (Id. at 279.)
>
> HR moved for reconsideration of the $1.6 million award. The Magistrate Judge denied the motion, concluding that the Proposed Findings of Fact and Conclusions of Law were not evidence, that there was sufficient evidence to support the $1.6 million figure in the form of HR's own records and Defendants' expert's unrefuted testimony, and that at trial Defendants' expert qualified his calculation of $505,965, stating, "Yeah, when you take everything into account and if you accept the arguments in the counterclaim and if you find liability, that would be the amount . . . ." (Id. at 229.) The Magistrate Judge stated that it was "unclear" what the expert thought had to be taken "into account" to arrive at the $505,965 figure or even which counterclaim the expert was referencing. (Id. at 393.) What is clear, at least to us, is that the expert directly, albeit confusingly, undermined the $1.6 million figure and did so right on the heels of having first espoused it.
>
> Given the contradictions noted above, the inadequate explanation by the parties and the Magistrate Judge of those contradictions, and the somewhat haphazard portions of the record presented to us on appeal, we are unable to determine that the Magistrate Judge's award of $1.6 [sic] was clearly erroneous – or that it was not. Accordingly, we will remand this issue to the Magistrate Judge for clarification or recalculation of that award. We are confident that, following clarification or recalculation, there will be no need for further review.

Third Circuit Opinion at 6-8 (footnote omitted).

In light of the Third Circuit Court of Appeals' remand quoted above, the court held a hearing on January 21, 2010 (the "Remand Hearing"). Prior to the Remand Hearing, this court ordered the parties to submit prehearing memoranda listing, inter alia, all witnesses and exhibits to be introduced at the Remand Hearing (Doc. Nos. 77 and 78). The parties submitted Proposed Findings of Fact and Conclusions of Law prior to the Remand Hearing (Doc. Nos. 79 and 80). Counsel also submitted Proposed Findings of Fact and Conclusions of Law after the

4

Remand Hearing (Doc. Nos. 93 and 94). On March 29, 2010, plaintiff submitted a response to the Proposed Findings of Fact and Conclusions of Law submitted by Logistics (Doc. No. 95).

On March 17, 2010, well after the conclusion of the Remand Hearing, plaintiff filed a Motion to Strike Defendants' Expert Report, Expert Testimony, and Evidence of Damages Pursuant to Fed. R. Evid. 702 and 703 (the "Motion to Strike") (Doc. No. 92). Counsel for Logistics filed an opposition to the Motion to Strike on April 5, 2010 (Doc. No. 96). Plaintiff filed a Reply by letter dated April 12, 2010.[3]

### III. DISCUSSION

#### A. Logistics' Counterclaims and the Licensing Agreement

At the Remand Hearing, Logistics presented testimony and evidence regarding amounts due to Logistics by HR under the Licensing Agreement. This court will briefly address Logistics' counterclaims and the Licensing Agreement at issue.[4]

Defendant Logistics asserted three counterclaims against HR based upon a certain Licensing Agreement. See Answer with Affirmative Defenses of Defendants with Counterclaims Against Plaintiff by Defendant Centrix HR Logistics, Inc. at 10-14 (the "Ans. with Counterclaims"). It is undisputed that plaintiff, as licensor, and Logistics, as licensee, entered into a Licensing Agreement dated March 15, 2002 (the "Licensing Agreement"). See Ans. with Counterclaims ¶5; Plaintiff's Answer to Defendants' Counterclaims ¶5 ("Pl.'s Ans. to

---

[3] The court will address the Motion to Strike herein.

[4] Reference is made to the March 2008 Opinion for a complete discussion of Logistics' Counterclaims and the Licensing Agreement.

Counterclaims"). Plaintiff and Logistics each submitted a copy of the Licensing Agreement as an exhibit at the trial ("Tr. Ex."). See Tr. Ex. P-2; Tr. Ex. D-7.

Pursuant to the terms of the Licensing Agreement, HR was to provide employment related services to Logistics. See, e.g., Licensing Agreement ¶¶ 3, 6. Pursuant to the terms of the Licensing Agreement, HR was to collect payments owed by Logistics' clients for services provided. See Licensing Agreement ¶ 3A. Logistics was to instruct all clients to make payment for services to HR at an address specified by HR. See Licensing Agreement ¶ 5. The Licensing Agreement required HR to deposit all monies thus collected into a General Operating Account ("GOA"). All funds necessary to timely pay HR's payroll taxes, withholdings, and statutory additions were to be transferred to an escrow account from the GOA. See Licensing Agreement ¶ 6. Any funds received from clients or from any funding source in excess of the monetary requirements to timely pay Licensor's payroll, withholding, statutory additions, funding fees charged to HR by the funding source, and service fees due and owing to HR, were to be deposited into a Reconciliation Account and dispersed to Logistics on a daily basis. Id.

In the Counterclaims, Logistics argued, inter alia, that HR violated various terms of the Licensing Agreement. Specifically, Logistics argued in its Counterclaims that, inter alia, in violation of the Licensing Agreement, and despite demands made by Logistics, HR never deposited the fees due to Logistics into the Reconciliation Account, never disbursed those fees to Logistics, and improperly retained and converted those fees to its own use. (Counterclaims ¶ 11.) Logistics also asserted in its Counterclaims that HR, in violation of the Licensing Agreement, failed to: (1) report and/or pay all applicable federal, state and local payroll taxes and unemployment insurance for employees provided by HR to its clients; (2) provide Logistics with

weekly reports detailing HR's invoicing of clients, collection of fees from clients, payment of payroll to employees, payment of withholding and statutory additions and benefits administration services; (3) provide Logistics with monthly, quarterly and annual financial statements, including a balance sheet and income statement; and (4) provide Logistics with copies of HR's state and federal income tax returns. The Licensing Agreement was terminated by Logistics on December 1, 2003. (Counterclaims ¶¶ 12-20.)

In its Counterclaims, Logistics argued that the conduct described therein in paragraphs one through twenty constitutes a material breach of the terms of the Licensing Agreement (counterclaim alleging breach of contract). In addition, Logistics specifically asserted that the failure of HR to deposit the fees due to Logistics in the Reconciliation Account and retaining those fees constitutes conversion by HR of Logistics' funds and assets (counterclaim alleging conversion). Finally, Logistics maintained that as a result of HR's conduct, Logistics is entitled to an accounting of all sums received by HR from clients and funding sources and all payments made to HR pursuant to the terms of the Licensing Agreement and to have remitted to Logistics all fees due (accounting counterclaim). (Counterclaims ¶¶ 21-27.) After the trial, the court entered judgment in favor of Logistics and against plaintiff on counts 1 and 2 of the Counterclaim (breach of contract and conversion), and entered judgment in favor of HR and against Logistics on count 3 of the Counterclaim (accounting). See March 2008 Opinion at 37-39.[5]

---

[5] The court has summarized the Counterclaims for the purpose of addressing HR's claim that Logistics failed to raise as a Counterclaim that plaintiff HR failed to make payments as required under the Licensing Agreement. As this court concluded at the trial and in the March and June 2008 Opinions, Logistics adequately plead as a counterclaim that plaintiff violated the terms of the Licensing Agreement, including a counterclaim that plaintiff failed to turn over fees

7

**B.     Evidence Presented at the Remand Hearing by Logistics**

At the Remand Hearing, Logistics presented the testimony of its trial expert Charles S. Lunden, CPA. For the trial, Mr. Lunden issued a report (the "Lunden Report"). (Tr. Ex. D-50.) As noted by the Third Circuit Court of Appeals, and by this court in the March 2008 Opinion and the June 2008 Opinion, Mr. Lunden's testimony at the trial and the Lunden Report contained inconsistencies as to the amount owed by plaintiff to Logistics on its counterclaim for amounts due under the Licensing Agreement. In the Lunden Report at Exhibit A, Mr. Lunden noted that the "Total Net Amount Due Centrix Logistics" is "$505,965." Id. In the Lunden Report at Exhibit B, Mr. Lunden noted that the "Net Amount Due Defendant" is "$1,603,901." Id. Mr. Lunden and counsel to Logistics argued, at various times, that each number was the

---

owing to Logistics. This court further determined that plaintiff was not surprised at trial as to the nature of the Counterclaims. See March 2008 Opinion at 37 (court refused to consider a counterclaim not raised in the Counterclaims but did consider Logistics' counterclaim for unpaid fees under the Licensing Agreement); June 2008 Opinion at 11-12 (rejecting plaintiff's contention that Logistics abandoned its counterclaim for fees/commissions due under the Licensing Agreement). The Third Circuit Court of Appeals did not disturb this ruling.

Despite HR's protestations, Logistics clearly stated a Counterclaim based upon the Licensing Agreement for breach of contract and conversion. HR's assertions that Logistics was attempting to present a new or different Counterclaim at trial or the Remand Hearing are groundless. At the Remand Hearing, Logistics merely presented evidence to clarify its claim for monies owed to it by HR under the Licensing Agreement. The court again reaffirms that Logistics did not present a new Counterclaim or new theory for recovery at trial or the Remand Hearing.

At the Remand Hearing, plaintiff's counsel requested a continuance asserting that plaintiff was "ambush[ed]" because Logistics and its expert presented new evidence. (Remand Hearing at 45.) Counsel for Logistics argued that "Mr. Lunden did nothing more than explain in further detail how he arrived at his calculations in the two exhibits." Id. The court rejected plaintiff's request for a continuance noting that all of the documents used at the Remand Hearing were introduced at the original trial, other than Exhibit D-70, which plaintiff also listed as an exhibit at the Remand Hearing and to which plaintiff did not object. Id. at 47-49.

amount owed to Logistics by HR under the Licensing Agreement. Mr. Lunden attempted to explain at the trial that the lower dollar amount, the $505,965, was the amount owed to Logistics "when you take everything into account." (N.T., 10/24/07, at 194.)

At the Remand Hearing, the parties were asked to clarify the amount due to Logistics by plaintiff in counterclaim damages under the Licensing Agreement. See N.T., 1/21/10, at 3 (court emphasized that a "very limited remand" is before the court; "the issue is really the amount of the counterclaim damages").

1. **Lunden's Expert Report, Exhibit A.**

Logistics presented the testimony of Mr. Lunden at the Remand Hearing. Counsel for Logistics asked Mr. Lunden to explain Exhibit A to his expert report introduced at trial. Mr. Lunden testified that the $505,965 figure on Exhibit A of the Lunden Report is the "worst case basis," making all assumptions in the light most favorable of plaintiff. Mr. Lunden further testified as follows:

> When I first met Mr. Black, he described to me the nature of the dispute and that he didn't have any confidence in any of the financial statements that Mr. Mazzoni had put together. And the purpose of Exhibit A was to present a worst case scenario. If, for some reason, [the court] didn't find that the general ledgers that existed as of August 2003 were the most meaningful indication of the transactions between the parties, the purpose of Exhibit A was to present on a worst case basis, looking at other information, what the causation factors were that would enable [the court] to conclude whether or not the actions of Mr. Black caused the inability of Centrix HR to pay its taxes. And the purpose of Exhibit A was to look at everything on a worst case analysis, making assumptions in the most favorable light possible to Centrix HR as to what the amount of damages were. But it was dependent on two major offsets. The first significant offset were [sic] the transfers to EMG. And [the court] now ruled, as a matter of fact, that those transfers do not belong in the calculation.
> . . .
> Additionally, I included in my analysis on Exhibit A my measure of the operating losses that Centrix HR Logistics suffered. If you look at the books and

9

> records in their original form, those books reflect those losses. So if you determined that the general ledger balances that set forth the amounts payable between the two companies are accurate, then you would not take that offset. But I included it in Exhibit A in kind of a worst case scenario because I did not know whether or not [the court] would find the book's original entry to be reliable for measuring damages.

(Remand Hearing at 7-9.) Mr. Lunden explained again that Mr. Black had expressed concern that plaintiff's books and records prepared by Mr. Mazzoni may not have been reliable. Id. at 9-10.[6]

By way of example, with respect to the assumptions he made in calculating Exhibit A, Mr. Lunden explained that the $505,965 figure includes offsets in favor of plaintiff for transfers to EMG[7] in the approximate amount of $486,200. (Remand Hearing at 8.) This explanation is consistent with Mr. Lunden's testimony at the trial that $505,965 was the amount owing to Logistics "when you take everything into account." At the trial, Mr. Lunden testified with regard to Exhibit A and the $505,965 figure and explained as follows:

> Although I had no way of identifying what those pipeline payable disbursements were, I felt it appropriate to give the benefit of a doubt to say that all of the transfers to EMG during that transition period represented payment of preexisting payables for the old transactions prior to the establishment of the new venture.

---

[6] Plaintiff's counsel objected to Mr. Lunden's testimony arguing that the expert was "modifying his report to go in a different direction now." (Remand Hearing at 11.) This court rejected plaintiff's objection finding that the witness was "clarifying how he came up with the two different numbers" ($505,965 vs. $1.6 million). Id. at 13.

[7] EMG, or Employers Management Group Inc., was a company that provided back office functions, such as processing cash receipts or preparing payroll. EMG had numerous clients throughout the eastern United States. EMG was owned by defendant Black and his former business partner, Robert Brown. Defendant Black and Mr. Brown ended their professional affiliation in late 2000. In April 2001, defendant Black relinquished his ownership interest in EMG to Mr. Brown. See March 2008 Opinion at ¶¶ 19, 21-22.

> So, I've reduced my offset to account for that probability because my purpose here is to quantify what is the net economic affect of all the transactions generated by Centrix HR Logistics.

(N.T., 10/24/07, at 192.)

In its March 2008 Opinion, this court concluded that plaintiff was not entitled to offsets for loans it made to EMG. (March 2008 Opinion at 24-26.) Hence, the $505,965 figure is inaccurate because it is based upon inaccurate assumptions Mr. Lunden made in favor of plaintiff due to his lack of knowledge regarding what the court would decide on which offsets plaintiff would be allowed to take against amounts owed to Logistics under the Licensing Agreement.

In its June 2008 Opinion, this court explained that Mr. Lunden arrived at the lower figure of $505,965, "if you take everything into account and if you accept the arguments in the counterclaim and if you find liability." (June 2008 Opinion (citing N.T., 10/24/07, at 194).) The court then stated that it was "unclear" what was taken into account by Mr. Lunden to arrive at this figure. At the Remand Hearing, Mr. Lunden clarified the procedure he used to calculate the $505,965 figure. From Mr. Lunden's explanation, it is clear to this court that the $505,965 figure from Exhibit A to Lunden's Expert Report does not accurately represent the amount owing to Logistics by plaintiff under the Licensing Agreement.

### 2. **Lunden's Expert Report, Exhibit B.**

During the Remand Hearing, Mr. Lunden testified regarding Exhibit B to his report, which showed the amount owed to Logistics by plaintiff to be approximately $1.6 million.

> Exhibit B is an analysis of what the books of original entry show as of August 31, 2003, as the net intercompany balances between the two different entities. And it shows that if you look at the books of one entity and compare it to

the other entity, and you net all the due to, due from's out, they're within $139 of each other. And it would cost more than $139 to figure out why the two are different. But from an accounting standpoint, I would say that they are similar, that they come to the same conclusion, that they reflect the same economic set of transactions, they are essentially similar.

(Remand Hearing at 13-14.)

Logistics introduced into evidence at the Remand Hearing Exhibit D-70, which Mr. Lunden described as "a balance sheet [of HR] that was prepared from the trial balances that reflect the general ledger balances."[8] (Remand Hearing at 16.) Mr. Lunden explained that Exhibit D-70 is the "most meaningful source of information" because it was prepared by plaintiff's accounting staff, not by Blaise Mazzoni[9], and because it was prepared contemporaneously with its stated date of August 31, 2003. (Remand Hearing at 18.) According to Exhibit D-70, the amount owing to Logistics by plaintiff is $1,603,673.49. See Ex. D-70.

### 3. Plaintiff's Expert Report and Blaise Mazzoni's Tax Returns.

Plaintiff's expert, Christopher Nawn, appeared and testified at the trial, and submitted an expert report. See Tr. Ex. D-61. Plaintiff did not call Mr. Nawn to testify at the Remand Hearing. At the trial, Mr. Nawn did not dispute that plaintiff owed Logistics $1.6 million, and used this figure as a basis for his calculations. (June 2008 Opinion at 13; N.T., 10/23/07, at 175-76.) At the Remand Hearing, Mr. Lunden was questioned whether Mr. Nawn's expert report supported Mr. Lunden's conclusion that the $1.6 million was the amount owed by

---

[8] Exhibit D-70 was not a trial exhibit. Logistics identified Exhibit D-70 in its pretrial memorandum for the Remand Hearing. Plaintiff also listed Exhibit D-70 as its own exhibit, Exhibit P-60, for the Remand Hearing. (Remand Hearing at 47-48.) Plaintiff's counsel did not object to the admission of Exhibit D-70 into evidence. (Remand Hearing at 122.)

[9] Blaise Mazzoni, at all times relevant to this litigation, has been the owner of plaintiff.

plaintiff to Logistics. (Remand Hearing at 29.) Mr. Lunden noted Mr. Nawn's testimony where Mr. Nawn stated that he used Exhibit D-61 to prepare Blaise Mazzoni's tax returns.[10] (Remand Hearing at 33.)

Review of Exhibit D-61 is helpful in determining the amount owed by plaintiff to Logistics under the Licensing Agreement. Exhibit D-61 at HR089-090 is plaintiff's balance sheet as of December 31, 2002. As of that date, plaintiff reported "Licensee Fees & Comm. Payable" as $922,627.74. Similarly, plaintiff's balance sheet as of December 31, 2003, reported "Licensee Fees & Comm. Payable" as $1,888,392.81. (Tr. Ex. D-61 at HR058-059.) The figure espoused by Lunden in Exhibit B of his expert report, $1,603,901, is as of August 31, 2003. Mr. Lunden testified that the difference between the $1.6 million figure in Lunden's report and the $1,888,382.81 figure from Exhibit D-61 represents the difference in commissions from September 2003 through December 31, 2003.[11] See also Remand Hearing at 33-38, 41-43.

Moreover, the difference between these two numbers is $965,765.07, the approximate amount of deduction Mr. Mazzoni took on his 2003 tax return Schedule C relating

---

[10] Since plaintiff is owned by Mr. Mazzoni, plaintiff does not file a tax return separate from Mr. Mazzoni's. (Remand Hearing at 33-34.)

[11] Mr. Lunden addressed an inconsistency between plaintiff's December 31, 2003 balance sheet, which reported "Licensee Fees & Comm. Payable" as $1,888,392.81, and Mr. Nawn's report, which reported "Licensing and Commissions Payable" as $1,688,393. (Tr. Ex. D-61 at Ex. A.) Mr. Lunden explained that the difference is a typographical error. The evidence supports this explanation. In Exhibit A of his expert report (Tr. Ex. D-61), Mr. Nawn recites the "Licensing and Commissions Payable" as of December 31, 2002 as $922,628, the figure reported on plaintiff's December 31, 2002 balance sheet. The amount of such payables for 2003 is the figure reported on plaintiff's December 31, 2003 balance sheet – $1,888,392.81.

to plaintiff[12]. See Tr. Ex. D-61 at HR099. Mr. Lunden explained the significance of this claimed deduction on Mr. Mazzoni's tax return.

> So what Centrix HR, LLC was saying to the federal government is, this is not our money. Because it is not our money we don't have to pay tax on it. And if you look at the amount that they deduct over a two-year period, it's $1,888,000. They take a deduction for licensing and commissions payable. And I submit that that arises from the licensing agreement and the nature of the transactions between the parties during the relevant time frame.
> . . .
> So he classifies on his tax return $961,000 of costs for licensing fees and commissions that are not his income but are due to somebody else. . . . That would be due to Logistics. As you look at the Licensing Agreement, that's the amount of money that should have been transferred into the escrow account and wasn't. In part, because if you look at Exhibit A of Mr. Nawn's report, Mr. Nawn tries to characterize what happened to the money. And he is saying it was transferred to EMG. So it's part of the transfers that appear at the very bottom of Exhibit A.

(Remand Hearing at 30, 37.)

### 4. Mr. Lunden's Conclusion.

Mr. Lunden concluded that the $1.6 million figure "is the most meaningful estimate of the economic harm" between plaintiff and Logistics. (Remand Hearing at 39-40.) The evidence submitted at the trial and the Remand Hearing support this conclusion. Plaintiff presented no evidence at the Remand Hearing to counter the testimony of Mr. Lunden. Mr. Mazzoni was present in the courtroom but was not called to testify regarding the information contained in his tax returns. Plaintiff's expert, Mr. Nawn, was not called to testify regarding amounts on the tax returns he prepared for Mr. Mazzoni or to explain where Mr. Lunden's analysis contained error. This court finds the testimony of Mr. Lunden, the only evidence presented at the Remand Hearing, to be credible and persuasive.

---

[12] The amount of deduction claimed by Mr. Mazzoni for "Licensee Fees & Comm. Payable" was $961,715. (Tr. Ex. D-61 at HR0099.)

The court must, however, distinguish between two figures as the measure of damages owed to Logistics – $1,603,673.00 and $1,603,901.00. In the March 2008 Opinion, this court awarded Logistics $1,603,673.00 on its Counterclaims. (March 2008 Opinion at 37-38.) The court obtained this figure from Lunden's Report at Exhibit B. (Tr. Ex. D-50.) This figure was identified as "LP Centrix HR Logistics CR," and was calculated using plaintiff's own books and records. Id. As noted by the Third Circuit, Exhibit B actually contains two figures. The second figure is in the amount of $1,603,901, and is identified as "Net Amount Due Defendant." Id. See Third Circuit Opinion at 7 n.1. The Third Circuit declined to address this discrepancy since neither party sought correction. Id.

This court, however, given the protracted proceedings in this matter and in an effort to be very clear and correct in its determinations, sought an explanation at the Remand Hearing as to which figure correctly represents the amount of damages owed to Logistics by plaintiff. The following colloquy took place at the Remand Hearing:

> Court:    The Court of Appeals in a footnote noted the discrepancy between the 1,603,673, which is the number I used, and the 1,603,901. What number should it be?
>
> Lunden:   I don't know. . .. The two books don't agree with each other. That is not uncommon in preparing financial statements that summarize thousands and thousands of transactions. And I don't think it matters. I would say that damages, at best, are estimates and they are based on the most meaningful information that's available and that the two sets of records are close enough to each other that either one would be a meaningful estimate of the amount that one company believes is due the other company.

(Remand Hearing at 14.) Mr. Lunden also made the very practical observation that "it would cost more than $139 to figure out why the two are different." Id. at 13. Mr. Lunden stated as

follows later during the Remand Hearing.

> Court: Is it 1,603,901 that's on Exhibit B of your report, as opposed to the number I used, 1,603,673, which is part of the long-term liabilities. Do you see that, there's a number of 1,603,673, which is listed under long-term liability Centrix HR Logistics CR.
>
> Lunden: Yes, Your Honor.
>
> Court: I used that number, which apparently is not the correct number.
>
> Lunden: In my opinion, it is not quite the correct number because it's part of a whole series of accounts that net to 1,603,901.
>
> Court: 1,603,901 is the correct number?
>
> Lunden: In my opinion, yes.

(Remand Hearing at 40.)

Mr. Lunden admitted to being unsure which figure best represented the amount of damages suffered by Logistics. Mr. Lunden stated that the difference between the numbers is $139, when the difference is actually $227.51. Additionally, Mr. Lunden explained that Exhibit D-70 is the "most meaningful source of information" because it was prepared by plaintiff's accounting staff, not by Blaise Mazzoni, and because it was prepared contemporaneously with its stated date of August 31, 2003 using plaintiff's own balance sheet. (Remand Hearing at 18.) According to Exhibit D-70, the amount owing to Logistics by plaintiff is $1,603,673.49. See Ex. D-70. Plaintiff presented no evidence on this issue.

Given the confusion in the testimony regarding these two figures, and in light of the Third Circuit Court of Appeals' decision not to disturb the lower figure originally accepted by this court of $1,603,673.00, the court declines to amend the judgment order in this regard.

### 5. The Inexactitude of the Damage Amount.

Counsel for plaintiff questioned Mr. Lunden in detail at the Remand Hearing pointing out that the damage amount espoused by Mr. Lunden for Logistics' Counterclaims is not without uncertainty. For example, Mr. Lunden admitted that the damage figure he calculated is the "net effect of all the economic transactions" between the parties. (Remand Hearing at 112.) Mr. Lunden admitted that he could not "say with certainty that those are fees and commissions." Id. However, Mr. Lunden did testify that in his opinion, the numbers are "directly related to the Licensing Agreement" and that the monies should have been placed in the Reconciliation Account as alleged in the Counterclaims (Counterclaims ¶11). See Remand Hearing at 30, 37, 112. See also Remand Hearing at 112-13 (Plaintiff's counsel questioning Mr. Lunden regarding certain general ledger entries that appear to predate the Licensing Agreement, and Mr. Lunden's response); 116-17 (Mr. Lunden cannot "rule it out" that the $1.6 million figure includes disallowed receivables).

It has long been the law in the Third Circuit Court of Appeals that "the law does not command mathematical preciseness from the evidence in finding damages, [but] sufficient facts must be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture." Rochez Bros., Inc. v. Rhoades, 527 F.2d 891, 895 (3d Cir. 1975). See also Acumen LLC v. Advanced Surgical Servs., 561 F.2d 199, 214 (3d Cir. 2009) (citing Rochez Bros. when stating, "the law does not require exact precision in the calculation of damages"). This is particularly true where, as here, plaintiff's own actions make such certainty impossible. See Third Circuit Opinion at 11 ("In cases where a defendant's wrongful conduct renders an exact calculation of damages difficult, . . . courts will not permit a defendant to profit from its

misconduct by allowing the defendant to avoid damages based on the plaintiff's failure to provide precise evidence of damages.").

Here, because Mr. Mazzoni, as the sole owner of plaintiff, did not place the amounts due Logistics into the Reconciliation Account as required by the Licensing Agreement, Logistics had to "go through all of this documentation and study to determine at the end of the day what [plaintiff] owed Logistics." (Remand Hearing at 109-10.) Plaintiff will not be heard to complain about the inexactitude of the damages when the actions of plaintiff's owner, Mr. Mazzoni, impeded Logistics' ability to calculate the damages with greater precision. This court finds the evidence presented at the trial and the Remand Hearing to be sufficient for this court to arrive at an intelligent estimate of Logistics' damages on its Counterclaims without speculation or conjecture.

### 6. Plaintiff's Motion to Strike.

As noted above, well after the conclusion of the Remand Hearing, plaintiff filed a Motion to Strike Defendants' Expert Report and Testimony Pursuant to Fed. R. Evid. 702 and 703. In its Motion to Strike, plaintiff again raises its failed argument that "[d]efendants did not pursue a counterclaim for fees at the underlying trial." See supra n. 5. The court has rejected this assertion numerous times and does so again.

In the Motion to Strike, plaintiff also raises arguments concerning the quality of the evidence presented at the Remand Hearing asserting that the evidence presented was too speculative to form a basis for an award of damages to Logistics. For example, plaintiff argues that Mr. Lunden's reliance on plaintiff's balance sheets which identify certain amounts as "License Fees and Commissions" was improper because the balance sheets "do not identify

18

license fees and commissions owed to whom and for what." (Pl.'s Mem. of Law Supp. Mot. to Strike at 12.) Mr. Lunden credibly testified that these amounts were related to the Licensing Agreement and to Mr. Black's companies. To the extent that these amounts were related to other entities or relationships, Mr. Mazzoni, who was present at the Remand Hearing, could have so testified, but did not.

While this court acknowledges that Logistics, as counterclaim plaintiff, bears the burden of proving its damages, plaintiff cannot cast doubt upon the evidence presented only in argument by counsel, especially when a witness was available at the Remand Hearing to counter the evidence presented. The testimony of the witnesses is the evidence, not the argument of counsel. The court finds the testimony of Mr. Lunden, the only evidence presented at the Remand Hearing, to be credible, relevant, competent, reliable, basically unchallenged by other evidence and not so speculative as to preclude the calculation of damages in favor of Logistics on its successful counterclaim.

To the extent the Motion to Strike raises issues that could have been raised at trial or the Remand Hearing, they are untimely and waived pursuant to Fed. R. Evid. 103(a)(1). See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238-39 (1940) (counsel "cannot as a rule remain silent, interpose no objection, and after a verdict has been returned seize for the first time" on a claim of error).

For all the above reasons, the court reaffirms its award of $1,603,673.00 in damages to Logistics on its Counterclaims and the Motion to Strike is denied. An appropriate order will be entered.

BY THE COURT:

/s/  Thomas J. Rueter
THOMAS J. RUETER
Chief United States Magistrate Judge